### UNITED STATES of America

v.

### Jonathan Ray BRADLEY, a/k/a Fresh Emanuel S. Harrison, a/k/a Paradise, Michael Murray, a/k/a Solo.

Crim. Nos. 1:CR–92–200–01, 1:CR–92–200–03 and 1:CR–92–200–04.

United States District Court,
M.D. Pennsylvania.

May 3, 1994.

---

William A. Behe, U.S. Atty.'s Office, Harrisburg, PA, for U.S.

Frank W. Nocito, Kingston, PA, William John Fulton, Harrisburg, PA, for defendant Jonathan Ray Bradley.

Jonathan Ray Bradley, pro se.

Robert C. Wee, Lancaster, PA, for defendant Jemeke Stukes.

Jemeke Stukes, pro se.

Salvatore P.J. Vito, Stroudsburg, PA, for defendant Emanuel S. Harrison.

Emanuel S. Harrison, pro se.

Robert Niele Tarman, Joshua D. Lock, Harrisburg, PA, Charles Witaconis, Scranton, PA, David A. Ruhnke, West Orange, NJ, for defendant Michael Murray.

Michael Murray, pro se.

L. Rex Bickley, Harrisburg, PA, for defendant Nathan Jones.

Nathan Jones, pro se.

Anthony Spencer, pro se.

Frank C. Arcurri, York, PA, for defendant John Doe.

John Doe, pro se.

Samuel R. Gross, Ann Arbor, MI, Elaine R. Jones, Theodore Shaw, George Kendall, New York City, for NAACP Legal Defense and Educational Fund, Inc. amicus curiae.

## MEMORANDUM

RAMBO, Chief Judge.

Defendants are charged with various drug offenses and the January 28, 1992 murder of Juan Carlos–Bacallo. The government has charged Defendants pursuant to 21 U.S.C. § 848 which proscribes involvement in a continuing criminal enterprise and provides for the death penalty for certain murders occurring within the course of such an enterprise. The government is seeking the death penalty for defendant Murray. Trial is scheduled to commence on June 6, 1994. Before the court is defendant Murray's pretrial motion which includes both a facial constitutional challenge to the federal death penalty statute and a challenge to the statute as applied to him. He also seeks discovery in connection with his selective prosecution claim and dismissal of various of the aggravating factors set forth by the government. These issues will be addressed *seriatim*.

*Discussion*

## I. Overview

Title 21 U.S.C. § 848, which proscribes the act of engaging in a "continuous criminal enterprise," further provides:

> [A]ny person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than twenty years, and which may be up to life imprisonment, or may be sentenced to death. ...

21 U.S.C. § 848(e)(1)(A). Defendants confronted with the potential of capital punishment are entitled to notice from the government of its intent to seek the death penalty, and of the statutory and non-statutory aggravating factors it intends to introduce to support that sentence. 21 U.S.C. § 848(h). Further, a defendant is due a separate hearing, before the jury or trial judge, on the sentencing issues. 21 U.S.C. §§ 848(g), (i). At the capital sentencing hearing, the prosecution must present aggravating factors which warrant sentencing the defendant to death. Section 848(n) enumerates twelve different aggravating factors.[1] *See* 21 U.S.C. § 848(n)(1)–(12). To impose the death penalty, the jury first must unanimously find one of the factors numerated at § 848(n)(1), and then at least one factor among §§ 848(n)(2) through (n)(12) beyond a reasonable doubt. 21 U.S.C. § 848(k). The jury, after making these first two findings, may then consider non-statutory aggravating factors submitted by the government. 21 U.S.C. § 848(h)(1)(B). The jury then weighs these competing circumstances to determine the propriety of the death sentence. 21 U.S.C. § 848(k). If the jury is unable to agree on a unanimous death verdict, it returns a life sentence. If a death sentence is imposed, the defendant has a right to appellate review as set forth in § 848(q).

## II. Whether § 848 is Being Unconstitutionally Applied to Defendant Murray in a Racially Discriminatory Manner

██ Defendant Murray first contends that 21 U.S.C. § 848 is unconstitutional because it arguably is being applied to him in a racially discriminatory manner. Defendant points to evidence that of the thirty-six capital prosecutions under § 848 so far authorized by the Attorney General, twenty-eight of the defendants, or 78% of the total, have been African–American. (Def.App.19A.) In contrast, from 1987 to mid 1990, only 16.7% of *all* § 848 defendants—both capital and non-capital—were African–American. (*Id.* at 25A.) Defendant maintains that the chances that this result is statistically random is less than one in a million. (*Id.* at 26A.) Defendant argues that these statistics indicate that the decisions to seek the death penalty under § 848 are influenced by impermissible racial factors and that, consequently, the burden should shift to the government to set forth a legitimate reason for the racial disparity in these prosecutions. Defendant's position rests upon both Eighth Amendment and equal protection arguments.

In response, the government notes that it sought the death penalty against all three Defendants, all of whom are African–American, but that its request was approved only as to defendant Murray, the member of the group who allegedly carried out the murder of Mr. Bacallo. The government also insists that several statutory aggravating factors apply, providing a legitimate basis for the death penalty prosecution against Murray.

The penultimate case on this issue is *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), which addressed both the equal protection and cruel and unusual punishment arguments which defendant Murray raises here. In *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a black capital defendant sought habeas relief alleging, *inter alia*, that Georgia's capital sentencing scheme was being applied in a racially discriminatory manner. The petitioner's primary evidence of

---

1. In addition to the factors listed in § 848(n), the prosecution has the option of presenting additional aggravating factors, provided that the defendant is given notice in advance of the entire trial of the prosecution's intent to do so. 21 U.S.C. § 848(n), 848(h)(1)(B).

the discrimination was an extensive statistical research project, the "Baldus study," that analyzed over 2,000 murder cases in Georgia and concluded that decisions to seek the death penalty were racially skewed. Defendants who had killed white victims received the death penalty in 11% of cases, but those charged with killing blacks only received the death penalty in 1% of the cases. *Id.* at 286, 107 S.Ct. at 1764. The study further demonstrated that blacks who killed whites were likely to receive a death sentence in 22% of the cases, whites who killed whites, in 8% of the cases, blacks who killed blacks, 1% of the cases, and whites who killed blacks, 3% of the cases. *Id.* at 286, 107 S.Ct. at 1764. Finally, the study found a substantial disparity between the rates at which prosecutors sought the death penalty for black defendants who had killed white victims (70% of the cases) in contrast to black defendants and black victims (15% of the cases) or white defendants and black victims (19% of the cases). *Id.* at 287, 107 S.Ct. at 1764.

The Court first addressed the petitioner's equal protection argument [2] based on the statistical evidence that defendants who kill whites are more likely to receive the death penalty, and that black defendants are more likely to receive the death penalty than white defendants. *Id.* at 291, 107 S.Ct. at 1766. As a black defendant who had killed a white police officer, both facts were relevant to McCleskey's situation. The Court noted that to succeed on this claim, the petitioner would have to show both discriminatory purpose and a discriminatory effect of the sentencing scheme. *Id.* at 292, 107 S.Ct. at 1767. The Court determined that the defendant could not show the former, as applied to him. It explained that the statistics that the petitioner submitted may have shown systemic discrimination, but that they had no direct nexus to his case. The Court acknowledged that in certain actions—such as jury venire violation and Title VII cases—courts have permitted statistical evidence to establish the requi-

site intent. However, the Court concluded that the capital sentencing situation was fundamentally different. *Id.* For example, the idiosyncracies and uniqueness of individual juries, *id.* at 294, 107 S.Ct. at 1768, the inability to question the juries' beliefs behind capital verdicts, the vast number of factors arising from the characteristics of the defendants and offenses, which influence the capital decisions, *id.*, the broad discretion vested in prosecutors, and the difficulty in examining, after the fact, their capital decisions, all counsel against giving much significance to mere statistics. *Id.* at 296, 107 S.Ct. at 1769. The Court commented:

> Implementation of these [criminal] laws necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decision at issue in this case also counsel against adopting such an inference from the disparities indicated by the Baldus study.

*Id.* at 297, 107 S.Ct. at 1770. Finally, the Court noted that the government *had* justified its decision to seek the death penalty against McCleskey, since one of the statutory bases for the penalty had been satisfied. *Id.* The Court thus concluded that the petitioner had failed to make out a meritorious equal protection argument.

*McCleskey* is arguably distinguishable from the case at bar. In that case, the bias of juries and of the numerous prosecutors, practicing throughout Georgia over a length of time, were at issue. Here, Defendant does not argue that § 848 capital defendants have been *convicted* in a racially disparate manner, but that they have been approved as capital defendants in a racially disproportionate manner. Moreover, these capital decisions have been made by a very small number of Attorneys General who authorized federal death penalty prosecutions over a relatively short time period.

---

**2.** The *McCleskey* court considered the equal protection clause of the Fourteenth Amendment while at issue in this federal prosecution is the equal protection clause of the Fifth Amendment. The two clauses have been identically interpreted in this context. *Bolling v. Sharpe,* 347 U.S. 497,

499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975) (quoting *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964)).

Nonetheless, *McCleskey* counsels that statistical evidence alone is insufficient to satisfy the "discriminatory purpose" prong of an equal protection claim. This court is not persuaded that *McCleskey* is sufficiently distinct such that its holding is inapplicable to this case. Therefore, Defendant's equal protection argument, based solely on statistical evidence and analysis of thirty-six capital defendants, must fail to the extent that it seeks dismissal of the indictment.[3]

The *McCleskey* Court also considered the petitioner's argument that the Georgia capital sentencing scheme violated the Eighth Amendment's protection against cruel and unusual punishment. The Court first explained that Georgia's sentencing scheme properly accommodated constitutional principles requiring a limitation on the discretion allotted to the sentencing body to impose the death penalty (via aggravating circumstances) along with room to present mitigating factors. *Id.* at 301–06, 107 S.Ct. at 1772–75. McCleskey argued that the sentence was arbitrary as applied to him, since it was imposed in an allegedly racially discriminatory manner. *Id.* at 308, 107 S.Ct. at 1775. The Court held that the Baldus study did not indicate so significant a possibility of racial prejudice tainting the sentencing scheme as to render Georgia's sentencing scheme unconstitutional. *Id.* at 313, 107 S.Ct. at 1778. The Court explained that while the study suggested the existence of sentencing discrepancies based on race, that disparities were inherent in any sentencing scheme and should not be presumed to be based on "invidious" factors. *Id.* at 312–13, 107 S.Ct. at 1778.

In the case at bar, Defendant has presented only evidence such as the type rejected by the McCleskey Court. Defendant's statistics merely show the *possibility* that race has influenced the government's decisions to seek the death penalty under § 848. This court can not conclude that the statistics offered by Defendant warrant dismissal of the indictment in light of the Supreme Court's ruling in *McCleskey*.

**3.** Defendant's request for discovery and/or an evidentiary hearing is addressed separately be-

low.

### III. Whether the Court Should Order Discovery of Documents and Testimony, or an Evidentiary Hearing, About the Decision to Seek the Death Penalty in Order to Pursue a Claim of Racial Discrimination

#### A. Standard and Application

Defendant contends that the decision to seek the death penalty against him is tainted by racially impermissible factors. As discussed above, he seeks dismissal of the indictment on this ground but, in the alternative, requests discovery or an evidentiary hearing to support his racial discrimination argument.

■ There is a presumption that prosecutions are commenced in good faith and without a discriminatory motive. *Attorney General v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C.Cir.1982), *cert. denied sub nom.*, *Irish People, Inc. v. Smith*, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983) (quoting *United States v. Falk*, 479 F.2d 616, 620 (7th Cir.1973)). Moreover, prosecutors retain substantial discretion to determine when and whom to prosecute. *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); *United States v. Berrigan*, 482 F.2d 171, 180 (3d Cir.1973). The decision to prosecute rests on a wide number of factors:

[Some of the] considerations are the likelihood of conviction, turning on the choice of a strong case to test uncertain law, the degree of criminality, the weight of the evidence, the credibility of witnesses, precedent, policy, the climate of public opinion, timing and the relative gravity of the offense.... Still other factors are the relative importance of the offense compared with the competing demands of other cases on the time and resources of investigation, prosecution and trial.... All of these considerations point to the wisdom of vesting broad discretion in the United States Attorney.

*Id.* at 180–81 (quoting *Pugach v. Klein,* 193 F.Supp. 630, 635 (S.D.N.Y.1961).) Courts, therefore, have been reluctant to question the motives of prosecutors. "Examining the basis of prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Wayte,* 470 U.S. at 607, 105 S.Ct. at 1530.

█ Nonetheless, the prosecutor's discretion is not unlimited. *Id.* at 608, 105 S.Ct. at 1531. For example, the choice of whom to prosecute may not be based on impermissible factors, such as race or religion. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). Defendant argues that an impermissible factor—race—has tainted the government's decision to seek the death penalty against him. To make out a prima facie case of selective prosecution, Defendant bears the burden of proving two elements:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). *See also Attorney General,* 684 F.2d at 946–47; *United States v. Eklund,* 733 F.2d 1287, 1290 (8th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985) (citing *United States v. Catlett,* 584 F.2d 864, 866 (8th Cir.1978)); *United States v. Diggs,* 613 F.2d 988, 1003 (D.C.Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). In other words, the defendant must show both a discriminatory effect and discriminatory purpose. *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531. This is a heavy burden. *Eklund,* 733 F.2d at 1290.

The standard for obtaining an evidentiary hearing on the matter is somewhat lower:

A hearing is necessitated only when the motion alleges sufficient facts to take the question past the frivolous state, *United States v. Erne,* 576 F.2d 212 (9th Cir.1978), *United States v. Oaks,* 508 F.2d 1403, 1404 (9th Cir.1974), and raises a reasonable doubt as to the prosecutor's purpose. *United States v. Peskin,* 527 F.2d 71, 86 (7th Cir.1975); *United States v. Falk,* 479 F.2d 616, 620–21 (7th Cir.1973) (en banc).

*Eklund,* 733 F.2d at 1290–1291.

█ The standard for discovery is even lower. The defendant must merely make out "a colorable entitlement to the defense of discriminatory prosecutions," *Berrigan,* 482 F.2d at 181 (citations omitted); *United States v. Murdock,* 548 F.2d 599, 600 (5th Cir.1977); *United States v. Cammisano,* 546 F.2d 238, 241 (8th Cir.1976); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974); *Attorney General of the U.S.,* 684 F.2d at 947; *United States v. Heidecke,* 900 F.2d 1155, 1158 (7th Cir.1990), or come forward with "some evidence tending to show the existence of the essential elements of the defense," *United States v. Schmucker,* 815 F.2d 413, 418 (6th Cir.1987) (quoting *United States v. Mitchell,* 778 F.2d 1271, 1277 (7th Cir.1985) and *Berrios,* 501 F.2d at 1211), or "take the question past the frivolous state." *United States v. Hazel,* 696 F.2d 473, 475 (6th Cir.1983) (quoting *United States v. Larson,* 612 F.2d 1301, 1304–05 (8th Cir.1980)); *United States v. Erne,* 576 F.2d 212, 216 (9th Cir.1978). As Justice Marshall has remarked,

> This standard ... is consistent with our exhortation that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States v. Nixon,* 418 U.S. [683,] 709 [94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) ]. It also recognizes that most of the relevant proof in selective prosecution cases will normally be in the Government's hands. *Cf. Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473 [82 S.Ct. 486, 491, 7 L.Ed.2d 458] (1962). At the same time, the standard

adequately protects the Government from attempts by the defense to seek discovery as a means of harassment or of delay. *See United States v. Murdock*, [548 F.2d 599, 600 (5th Cir.1977) ].

*Wayte*, 470 U.S. at 624, 105 S.Ct. at 1539 (Marshall, J. dissenting).

 This burden requires that the defendant show a colorable claim on *both* elements of the selective prosecution defense. *Attorney General of the U.S.*, 684 F.2d at 947–48. Moreover, the defendant must demonstrate that the materials sought by discovery would be probative of the elements for selective prosecution. *Berrios*, 501 F.2d at 1211–12. However, the defense can not be used to commence a fishing expedition or to obtain discovery otherwise irrelevant to the action. If this were permitted, "[t]he effect could be to encourage use of the defense of selective prosecution, however baseless, as a means of obtaining discovery to which the defense would not otherwise be entitled." *Id.* at 1211. Finally, the decision whether or not to order discovery, or an evidentiary hearing, lies substantially within the trial court's discretion. *Id.* at 1212.

 Defendant contends that he has come forward with sufficient evidence to meet the standard required for discovery. As previously discussed, Defendant points to evidence that from 1987 to 1990, 16.7% of all defendants convicted pursuant to § 848 have been black. (Def.App.25A.) However, of the 36 capital defendants charged under the same statute, 78% have been black (while 11% have been white). (*Id.* at 19A.) Further, Defendant has submitted evidence that this disparity has only a one in one million chance of being statistically random. (*Id.* at 26A.)

As explained above, Defendant must first show a colorable claim that he was singly selected for prosecution. To do so, he would have to make a threshold showing that others—for example, white defendants—who have been eligible for the death penalty, because of the applicability of aggravating circumstances set out in § 848, have not faced capital prosecution. Defendant has not shown this. However, Defendant may not be able to establish this if the information needed is within the sole possession of the government. The number of individuals from whom the government has sought death penalty approval from the Attorney General very likely is not publicly available, and probably requires examination of government files.

What the defense has shown is that compared with one group of defendants—all of those charged under § 848—of whom some may be eligible for the death penalty, black defendants have been disproportionately subject to capital prosecutions. This *may* indicate that white § 848 defendants otherwise eligible for the death penalty have not been subject to death penalty prosecutions, which could show that Defendant Murray has been selectively chosen for this punishment.

Defendant must also make a colorable showing that the reason for his selective prosecution is an impermissible factor—here, race. This inquiry is, in this situation, intertwined with the first, since the statistical disparity that the defense has presented indicates both that Defendant may have been singled out for the death penalty and that such a decision was motivated by race. However, this prong requires some evidence of *intent* to racially discriminate.

Courts have disagreed about the import of disparate impact in an intent inquiry. At least one appellate court has reasoned that disproportionate impact on blacks as compared with whites *may* evidence the intent required under the subject inquiry. The Eleventh Circuit has stated:

> In deciding if a defendant has established selective prosecution, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). "Circumstantial evidence of invidious intent may include proof of disproportionate impact." *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69, 85 (1986) (citing *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976)). Indeed, under some circumstances proof of discriminatory impact "may for all practical purposes demon-

strate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Washington,* 426 U.S. at 242, 96 S.Ct. at 2049.

*United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987) (parallel citations omitted). Nonetheless, as discussed above, the Court in *McCleskey* held that statistical evidence of racial disparity is insufficient to establish an equal protection claim in a selective prosecution case such as this. *McCleskey,* 481 U.S. at 294, 107 S.Ct. at 1768. Nonetheless, *McCleskey* did not address the significance of disparate impact on the context of a *discovery* request. Because of the more lax standard under which a discovery request is examined, this court concludes that Defendant's evidence of disparate impact satisfies the intent prong.

Therefore, the court will permit the discovery that Defendant seeks. The court recognizes that this result conflicts with that in *United States v. Perry,* Crim. No. 92–474 (D.D.C. Jan. 11, 1994), in which a similar request was made to the government but rejected by that court. *Id.* at 17–18. Nonetheless, the court believes that the unique statute at issue warrants this result. Section 848 explicitly indicates a concern that it not be applied in a racially discriminatory manner, since it requires the jury to return to the court a certificate verifying that, *inter alia,* neither the defendant's nor victim's race influenced its sentencing decision. 21 U.S.C. § 848(*o*)(1). Moreover, the statute mandates that the Comptroller General conduct a study of the influence of race in capital sentencing determinations. 21 U.S.C. § 848(*o*)(1). These provisions indicate a Congressional concern about the very real possibility that race is a key factor in whether or not a particular defendant receives the death penalty. This court can only conclude that discovery on this issue, following the showing

that Defendant has already made, comports with legislative concern about racially disparate capital prosecutions.

However, the court notes it will not permit this discovery to serve as a delaying tactic so that the trial can once again be continued. Rather, the court will allow the defense a short amount of time to obtain the discovery it seeks, and admonishes both sides to be as cooperative as possible so as to ensure that discovery is timely completed.

### B. Privileges

The government contends that the material sought by Defendant is protected by the deliberative process privilege. *See Berrigan,* 482 F.2d at 181.[4] This principle extends to materials which are "predecisional and deliberative." *Wolfe v. Department of Health and Human Servs.,* 839 F.2d 768, 774 (D.C.Cir.1988) (citing *EPA v. Mink,* 410 U.S. 73, 88, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973)). The government also argues that the materials fall within the attorney work-product privilege.

At this stage, the court is unable to determine whether the information sought by Defendant would fall within either the deliberative process or work-product categories. However, once the defense sets forth precisely what information it seeks, the court will permit the government to reassert these privileges. The court might then order an *in camera* review of the documents to determine if they truly fall within the parameters of these two doctrines. *See, e.g., Berrios,* 501 F.2d at 1212.

### C. Use of the Discovered Material

Defendant contends that information gleaned from discovery would be presented to the jury, under one of two theories, neither of which this court believes is tenable.

---

4. In *Berrigan,* the court stated:
 It is well established that the executive branch is privileged not to disclose intra-governmental documents reflecting advisory opinion, recommendations and deliberations comprising part of a process by which governmental decisions are formulated. *Environmental Protection Agency v. Mink,* 410 U.S. 73, 85 [93 S.Ct. 827, 835, 35 L.Ed.2d 119] (1973). The privilege is

based upon the public policy of encouraging open, frank discussions between subordinate and chief concerning administrative action, and on the constitutional principle of separation of powers. *See, e.g., United States v. Cox,* 342 F.2d 167 (5th Cir.1965).... *United States v. Berrigan,* 482 F.2d 171, 181 (3rd Cir.1973) (parallel citations omitted).

■ First, the evidence of selective prosecution could be presented to the jury as a complete defense. However, the law counsels against such a use. *See Berrigan,* 482 F.2d at 174–76 (court refused to allow defendant to present evidence of selective prosecution to jury, holding that question one for court prior to trial); Fed.R.Crim.P. 12(b) ("The following must be raised prior to trial: (1) Defenses and objections based on defects in the institution of the prosecution …").

■ Second, the evidence could be submitted for the jury's consideration about what role race played in *the jury's* decision. The statute under which Defendant is being prosecuted explicitly provides:

> In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be. The jury shall return to the court a certificate signed by each juror that *consideration of the race,* color, religious beliefs, national origin, or sex of the defendant or the victim *was not involved in reaching his or her individual decision,* and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

21 U.S.C. § 848(*o* )(1) (emphasis added). This language focuses only on the jurors' possible prejudices, not those of the prosecution. Therefore, possible racial bias influencing the prosecutor's decision to seek the death penalty would be irrelevant to whether the jury was influenced by racial bias in its decision at the penalty phase.

Accordingly, the court will not permit Defendant to present evidence to the jury. The defense may, however, present its findings to the court. If the court determines that the evidence is sufficient under the constitutional principles herein discussed, it will order an evidentiary hearing and, if appropriate, a dismissal of the indictment.

## IV. Whether the Statute Provides Legally Adequate Review

■ Case law has repeatedly discussed the importance of ensuring adequate appellate review in death penalty cases. *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Gregg v. Georgia,* 428 U.S. 153, 204–06, 96 S.Ct. 2909, 2939–40, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, Stevens, JJ.); *Zant v. Stephens,* 462 U.S. 862, 890, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235 (1983). Defendant contends that the pertinent statute, 21 U.S.C. § 848, unconstitutionally curtails appellate review. That statute provides:

> (1) In any case in which the sentence of death is imposed under this section, the sentence of death shall be subject to review by the Court of Appeals upon appeal by the defendant. Notice of appeal must be filed within the time prescribed for appeal of judgment in Section 2107 of Title 28. An appeal under this section may be consolidated with an appeal of the judgment of conviction. Such review shall have priority over all other cases.
>
> (2) On review of the sentence, the Court of Appeals shall consider the record, the evidence submitted during the trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the especial findings returned under this section.
>
> (3) *The court shall affirm the sentence if it determines that—*
>
>> (A) *the sentence of death was not imposed under* the influence of passion, prejudice, or *any other arbitrary factor;* and
>>
>> (B) *the information supports the special finding of the existence of any aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.*

In all other cases the court shall remand the case for reconsideration under this section. The Court of Appeals shall state in writing the reasons for its disposition of the review of the sentence.

21 U.S.C. § 848(q)(1), (2), and (3) (emphasis added).

Defendant argues that the scope of review provided by this statute is unconstitutionally narrow and is contrary to the heightened reliability standard applicable in death penalty cases. Specifically, Defendant challenges the fact that the statute requires affirmance of the sentence unless the appellate court finds that the sentence was based on passion, prejudice, or an arbitrary factor, or if the evidence presented does not support the aggravating and mitigating factors found by the jury. Defendant maintains that many serious trial errors can not be categorized as "arbitrary" and would not warrant consideration by the appellate court under the statutory language.

■ This court is persuaded that if "arbitrary" is too narrowly interpreted, the statute could foreclose appellate review of arguably reversible trial errors. Nonetheless, as *Pretlow II* admonishes, courts should construe federal statutes, if possible, and within the bounds of Congressional intent, to avoid constitutional problems. *United States v. Pretlow*, 779 F.Supp. 758, 764 (D.N.J.1991) ("*Pretlow II*") (citing *Communications Workers v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988); *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988).) The statute can be read to provide for the appellate review required under the constitution. The district court in *Pretlow II,* faced with an identical argument, reasoned:

An error of law during the penalty phase of the trial which is found to be harmful must by definition be one which prejudiced the defendant by ultimately affecting either the record for the jury's consideration or the jury deliberations themselves. In either case, it means the jury's decision was not rendered in accordance with the law but rather was partially based on some impermissible factor. I believe such impermissible factors fall within the scope of the "arbitrary factors" as that term is used in Section 848(q)(3)(A).

*Pretlow II,* 779 F.Supp. at 764. *See also United States v. Chandler*, 996 F.2d 1073, 1083 (11th Cir.1993), *petition for cert. filed,* (Dec. 28, 1993); *United States v. Pitera*, 795 F.Supp. 546, 567 (E.D.N.Y.1992) (citation omitted) ("An arbitrary factor must perforce include errors of law that are not harmless, for such errors, particularly in the context of a weighing statute, may impermissibly tip the scales in favor of death.")

■ Defendant also argues that Congress has violated equal protection law by providing curtailed appellate review to death-sentenced defendants. As discussed above, this court interprets the pertinent clause in a manner which ensures meaningful appellate review. Again, if "arbitrary" is read to preclude reversal of a sentence imposed after a trial in which arguably reversible errors occurred, death-sentenced defendants would possibly have a meritorious equal protection argument. However, in construing the provision in a manner which comports with constitutional law governing appellate review, the court can not conclude that any equal protection principles are jeopardized.

## V. Whether the Government May Constitutionally Identify Non-statutory Aggravating Factors

### A. Background

Section 848 mandates that the government notify the capital defendant of:

[t]he aggravating factors enumerated in subsection (n) of this section and any other aggravating factors which the Government will seek to prove as the basis for the death penalty.

21 U.S.C. § 848(h)(1)(B). The government has notified Mr. Murray that it intends to introduce the following non-statutory aggravating factors during the sentencing phase:

(7) The offense was committed by you deliberately and with the reasonable expectation that the death of Juan Carlos–Bacallo would result.

(8) Juan Carlos–Bacallo was killed by you without reasonable provocation.

(10) You committed the offense while on parole for a drug conviction.

(11) You participated in two intentional, willful, deliberate and premeditated slayings in New York prior to the commission of this offense.

(12) There is a reasonable probability that you would commit criminal acts of violence that would constitute a continuing threat to society in the future.

(13) A deadly weapon, that is, a handgun, was used by you during the commission of this crime.

(14) At present, the United States is unaware of any evidence which would constitute "mitigating factors" as that term is used in 21 U.S.C. § 848(m).

Defendant makes several arguments why these non-statutory aggravating factors must be dismissed.

### B. Non-delegation Principle, *Ex Post Facto*, Proportionality Review

■ Defendant argues that the government's use of these non-statutory aggravating factors violates the non-delegation doctrine, the *ex post facto* bar, and requires proportionality review. The court rejects all three contentions. First, as discussed below, the non-statutory aggravating factors do not serve a narrowing function, as do the statutory aggravating factors, nor must the jury find any of them to impose the death penalty. Thus, by relying on these factors, the government is "engag[ing] in advocacy, not legislation," which would implicate the non-delegation doctrine. *See Pitera,* 795 F.Supp. at 560.

■ Neither does this use of non-statutory aggravating factors implicate the *ex post facto* doctrine in Article I, section 9 of the United States Constitution. That principle proscribes the increase of a punishment after the underlying offense has occurred. However, the death penalty can be directed even without the jury finding the existence of any non-statutory aggravating factors. Permitting the government to assert additional non-statutory aggravating factors neither increas-

es the possible punishment, nor alters the elements of the underlying crime. *See, e.g., Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (aggravating factors constitute neither separate penalties nor offenses). *See also Pitera,* 795 F.Supp. at 563–64. Therefore, the court can not conclude that the protections of the *ex post facto* clause are triggered in this instance.

■ Finally, the possibility of relying on non-statutory aggravating factors does not require proportionality review, as Defendant suggests. Death sentences need not be examined under proportionality review. *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879–80, 79 L.Ed.2d 29 (1984). Moreover, this court is not persuaded by Defendant's argument that *Pulley v. Harris* is inapplicable in sentencing schemes which permit the introduction of non-statutory aggravating factors. *See Pitera,* 795 F.Supp. at 559–60; *Pretlow,* 779 F.Supp. at 768–69 (D.N.J.1991); and *United States v. Cooper,* 754 F.Supp. 617, 626 (N.D.Ill.1990). Consequently, the government's non-statutory aggravating factors will not be dismissed under these arguments.

### C. Function of Aggravating Factors

Defendant contends that aggravating factors serve to narrow the category of defendants for whom death is sought, and that the non-statutory factors listed above fail to perform this function. The government, in response, maintains that this narrowing function has already been performed at the guilt stage, and in the finding of one of the factors in § 848(n)(1) and at least one among § 848(n)(2)–(12), and that the non-statutory factors simply provide the jury with additional, relevant information akin to that background and character evidence provided in any sentencing proceeding.

There are parameters on the admission of non-statutory aggravating factors. One body of death penalty case law focuses on the heightened reliability required of evidence admitted during a capital sentencing proceeding. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (requiring that death penalty procedures not

result in arbitrary and capricious decisions as to whom is sentenced to death); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (requiring heightened standard of reliability in capital proceedings); *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977) (plurality opinion) (holding presentence report, to which defendant was not permitted to respond, inadmissible as violative of Due Process Clause); *Johnson v. Mississippi,* 486 U.S. 578, 590, 108 S.Ct. 1981, 1989, 100 L.Ed.2d 575 (1988) (holding use of prior conviction later reversed prejudicial to defendant).

A second strand of case law, however, emphasizes the importance of presenting to the jury all relevant evidence. *See Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) (jury should be permitted to consider all relevant evidence about defendant); *Lockett v. Ohio,* 438 U.S. 586, 608, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978) (Burger, J., joined by Stewart, Powell, Stevens, JJ.) (defendant can not be precluded from presenting relevant mitigating evidence); *Barefoot v. Estelle,* 463 U.S. 880, 896, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983) (extending *Lockett* doctrine to prosecution and permitting admission of psychiatric evidence about defendant's future criminality); *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (permitting prosecution to submit victim impact statement).

▆▆ These strands set the guidelines for admitting evidence as to aggravating factors in capital sentencing hearings. Thus, under the "all relevant evidence" principle, the prosecutor should be free to submit evidence relating to aggravating factors which will assist the jury in making an individualized determination whether the defendant should be executed. On the other hand, under the heightened reliability doctrine, such evidence should be barred if irrelevant, unduly prejudicial, or if it arises from unfair procedures. These parameters, not a "narrowing function" analysis as suggested by Defendant, limit the admissibility of non-statutory aggravating factors. The court will examine the various non-statutory aggravating factors with these guidelines.

## D. Factors (7) and (8)

▆▆ The government proposes to utilize as non-statutory aggravating factors that "[t]he offense was committed by you deliberately and with the reasonable expectation that the death of Juan Carlos–Bacallo would result," and that "Juan Carlos–Bacallo was killed by you without reasonable provocation." The defense argues that these factors are duplicative of those already set out in § 848(n)(1), of which the jury must find at least one before considering the additional statutory and non-statutory aggravating factors. The government agrees and now seeks to amend its notice of aggravating factors to include these two under § 848(n)(1).

The court will not permit the government to use these two factors as non-statutory aggravating factors since they merely duplicate those listed in § 848(n)(1) of which the jury must find at least one. The duplication between the elements of the offense and the factors listed at § 848(n)(1), which issue is fully discussed below, is qualitatively different. The § 848(n)(1) factors, while duplicating the intent element of the offense, protect the defendant (by ensuring that the jury is confident of that element, particularly important in a multi-defendant case with multiple offenses) while also, arguably, prejudicing him. In contrast, since this § 848 is a weighing statute, the prejudice to the defendant by permitting multiple expressions of a single aggravating circumstance is unduly unfair, and provides absolutely no benefit to the defendant. The court will not permit the government to assert every possible permutation of an aggravating circumstance, which would give the government free reign to trump whatever mitigating factors are raised by the defendant.

▆▆ Moreover, the court will not allow the government to add these factors to those found at § 848(n)(1) since the government has not shown good cause for initially failing to include these factors in its notice to the defendant stating its intent to seek the death penalty. 21 U.S.C. § 848(h)(2). Therefore,

the court will dismiss these two non-statutory aggravating factors.

## E. Factor (10)

■■■ The government seeks to demonstrate that Defendant committed the alleged murder while on parole for a drug conviction. Defendant asserts that Congress limited admissible criminal history information by providing factors §§ 848(n)(2), (n)(3), and (n)(4).[5] However, finding one of these factors—§§ 848(n)(2), (n)(3), (n)(4)—or another between §§ 848(n)(5) and (n)(12), is the *minimum* the jury must find to impose a death sentence (along with finding one of the (n)(1) factors). The provisions can not be reasonably interpreted, however, to also provide a ceiling as to the information which may be submitted to the jury regarding criminal history. Therefore, this court can not conclude that the government is precluded from submitting information of Defendant's criminal history apart from the allowable under §§ 848(n)(2), (n)(3), and (n)(4). This factor will not be dismissed.

## F. Factor (11)

■■■ The government seeks to introduce evidence relating to two unindicted murders which defendant Murray allegedly committed in New York City. Defendant urges their exclusion. The Supreme Court has not decided the issue whether unadjudicated offenses may be admitted during the sentencing phase of a capital trial. *But see e.g., Robertson v. California,* 493 U.S. 879, 879, 110 S.Ct. 216, 216, 107 L.Ed.2d 169 (1989) (Marshall, J., joined by Brennan, J., dissenting from denial of certiorari); *Miranda v. California,* 486 U.S. 1038, 1038, 108 S.Ct. 2026, 2026, 100 L.Ed.2d 613 (1988) (same); *Devier v. Kemp,* 484 U.S. 948, 948–49, 108 S.Ct. 338, 339, 98 L.Ed.2d 365 (1987) (same);

*Williams v. Lynaugh,* 484 U.S. 935, 935, 108 S.Ct. 311, 312, 98 L.Ed.2d 270 (1987) (same); *Sharp v. Texas,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988), (Marshall, J., dissenting from denial of certiorari). *See also Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987) (holding that use of unadjudicated crimes in capital sentencing proceeding does not violate eighth or fourteenth amendments).

State courts have divided on this issue, with several setting forth a per se rule of exclusion, several always permitting use of such evidence, and some permitting the evidence upon a showing that it is reliable under varying standards. *See generally* Steven Paul Smith, *Unreliable and Prejudicial: The Use of Extraneous and Unadjudicated Offenses in the Penalty Phases of Capital Trials,* 93 Colum.L.Rev. 1249, 1267 (1993).

Several courts have persuasively reasoned these unadjudicated offenses should not be admitted. *See, e.g., State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276, 281 (1979) (expressing concern about already tainted jury deciding defendant's guilt about prior unadjudicated offenses); *Cook v. State,* 369 So.2d 1251, 1257 (Ala.1978) (presumption of innocence precludes use of unadjudicated offenses in capital sentencing). Our own Pennsylvania Supreme Court has precluded admission of this evidence, reasoning that it "would lead to the injection of collateral and diverting issues and [would] ... produce confusion which could deprive an accused of the orderly trial to which he is entitled...." *Commonwealth v. McCoy,* 405 Pa. 23, 172 A.2d 795, 799 (1961). Later, elaborating on the heightened reliability required in death penalty cases, the same court explained that "[only p]rior convictions of record ... meet this standard of reliability; piecemeal testi-

---

5. These provisions permit the government to show that:
 (2) The defendant has been convicted of another Federal offense, or a State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.
 (3) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occa-

sions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.
 (4) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.
21 U.S.C. §§ 848(n)(2)–(4).

mony about other crimes for which appellant has not yet been tried or convicted can never satisfy this standard." *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58, 69 (1971).

Nonetheless, the court can find no binding or even persuasive authority that the court should *per se* exclude evidence of the unindicted murders. Particularly since federal case law has expressed a preference in favor of admitting evidence at the sentencing phase, to allow the jury to make an individualized determination, this court is hesitant to adopt such a rule.

On the other hand, the court is particularly concerned about the reliability of the offenses the government seeks to admit. The court views evidence of unadjudicated offenses as inherently unreliable, since no untainted jury, utilizing the Federal Rules of Evidence and the requisite burdens of proof, has found the defendant guilty. Use of these offenses truly jeopardizes the presumption that one is presumed innocent until found guilty.

The court concludes that the best solution, in the absence of case law to the contrary, is to permit the introduction of the evidence upon a showing of reliability. This balances the concern expressed above, with a desire to introduce sufficient evidence about Defendant in the sentencing proceeding so that the jury may make an individualized determination of the propriety of the death sentence. Therefore, the parties will be directed to submit briefs to this court as to the procedure and standard of review that would best ensure the requisite reliability.

### G. Factor (12)

■ The government seeks to submit as a non-statutory aggravating factor Defendant's continuing threat to society in the future. Defendant contends that this factor should be held void for vagueness. However,

as long as sufficient, relevant evidence is introduced about Defendant, the Supreme Court has permitted such an inquiry. *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) (Stewart, Powell, Stevens, JJ.) This factor will not be dismissed.

### H. Factor (13)

■ The government plans to introduce the fact that Defendant allegedly murdered Juan Carlos–Bacallo with a handgun. Defendant asserts that setting forth the instrument of the killing fails to narrow the class of defendants for whom the death penalty can be imposed. Once again, the court is not convinced that aggravating factors must *per se* perform a narrowing function. This factor will not be dismissed.

### VI. Whether Aggravating Factor n(1) Impermissibly Duplicates Elements of the Offense

■ At the capital sentencing hearing, the prosecution must present aggravating factors which would warrant sentencing the defendant to death. Section 848(n) enumerates twelve different aggravating factors. *See* 21 U.S.C. § 848(n)(1)–(12).

The first of these factors directs the trier of fact to consider whether the defendant intentionally killed the victim, a factor expressed in several ways.[6] Defendant argues that this factor is unconstitutional because it merely repeats an element of the offense already found by the jury at the guilt stage of the trial, thereby putting "the thumb on death's side of the scale."

Defendant's argument is precluded by the Supreme Court's decision in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the defendant had been convicted of first degree

---

6. Specifically, § 848(n)(1) provides:
 (1) The defendant—
 (A) intentionally killed the victim;
 (B) intentionally inflicted serious bodily injury which resulted in the death of the victim;
 (C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

 (D) intentionally engaged in conduct which—
 (i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and
 (ii) resulted in the death of the victim.
 21 U.S.C. § 848(n)(1).

murder, a crime punishable in Louisiana by death or life imprisonment. The statute under scrutiny in *Lowenfield* also listed statutory aggravating factors which would support a death sentence and provided for a bifurcated trial. The jury sentenced the defendant to death, basing its decision solely upon an aggravating factor that merely duplicated an element of the crime for which the defendant had already been convicted. The Court rejected the defendant's challenge to the statutory scheme, stating that the defendant's "argument that the parallel nature of [the] provisions requires that his sentence be set aside rests on a mistaken premise as to the necessary role of aggravating circumstances." *Id.* at 244, 108 S.Ct. at 554.

The Court upheld the Louisiana sentencing scheme, explaining that the Constitution is satisfied when capital sentencing schemes " 'genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others.' " *Id.* at 244, 108 S.Ct. at 554 (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)). The Court further expounded that this requirement could be met in one of two ways: either the legislature could narrow the definition of capital crimes, thus narrowing the class of persons eligible for the death penalty and justifying their differential treatment at the guilt stage, or the legislature could define the crime more loosely, and then provide juries with statutory aggravating factors to aid them in determining an appropriate punishment. *Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555. The Court found that since the Louisiana legislature had sufficiently narrowed its category of capital crimes,[7] the narrowing function required by the Constitution had been performed during the guilt phase of the proceedings. "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not

make this sentence constitutionally infirm." *Id.*

In the instant case, Congress has provided for the constitutionally mandated narrowing process at the guilt phase of proceedings brought under § 848. Only defendants who are charged under subsection (e) face the possibility of the death penalty. This subsection narrows the class of eligible defendants from those who are convicted of engaging in a continuing criminal enterprise to those who are convicted of doing so *and* of committing or partaking in the act of murder in the process. 21 U.S.C. § 848(e)(1)(A). Therefore, although the statutory aggravating factor listed in § 848(n)(1) may be merely duplicative of an element of the offense, this fact alone does not make the statutory scheme constitutionally infirm.

Furthermore, the *Lowenfield* Court upheld a statute that provided that an aggravating factor that merely duplicated an element of the offense was not constitutionally invalid even though the defendant's death sentence was based *solely* on the duplicative factor. In the instant case, the statutory scheme only contemplates the imposition of the death penalty if the trier of fact finds the existence of another of the statutory aggravating factors *in addition* to the duplicative factor listed in § 848(n)(1).

Defendant attempts to distinguish § 848 from the statute upheld in *Lowenfield.* Defendant stresses that, unlike the *Lowenfield* statute, § 848 is a weighing statute that requires the jury to balance the mitigating against the aggravating factors in determining the appropriate penalty. Defendant relies upon *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), for the assertion that the difference between weighing statutes and nonweighing statutes is crucial. In *Stringer,* the Court confronted the issue whether a death sentence could be automatically affirmed on appeal when the jury had considered an *invalid* aggravating factor in reaching its decision. The Court rejected a rule of automatic affirmance in such cases. *Id.* at 229, 112 S.Ct. at 1136, 117 L.Ed.2d at 378. The Court reasoned that:

---

7. Louisiana classifies homicides into five categories. Only first-degree murder is punishable as a capital offense. *See Lowenfield,* 484 U.S. at 241, 108 S.Ct. at 552.

when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume that it would have made no difference if the thumb had been removed from death's side of the scale. When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.

*Id.* at 232, 112 S.Ct. at 1137, 117 L.Ed.2d at 379.

Defendant correctly asserts that the statute in the instant case is a weighing statute. *See* 21 U.S.C. § 848(k). However, *Stringer* addressed the use of *invalid* factors in the weighing process, not the use of *duplicative* factors. Since the duplicative factor is not constitutionally invalid, and is a permissible statutory aggravating factor, it may be considered by the jury in arriving at a sentencing decision. As stated by one other district court, "[a] duplicative factor, unlike a vague one, does not risk the injection of an 'illusory circumstance' into the sentencing process." *United States v. Pitera,* 795 F.Supp. 546, 557 (E.D.N.Y.1992). Although this Court agrees with the characterization of the duplicative factor as unfortunate, *see United States v. Pretlow,* 779 F.Supp. 758, 773 (D.N.J.1991), the Court ultimately finds that the statutory scheme is constitutionally permissible in this respect.[8]

### VII. Whether Aggravating Factor n(12) is Unconstitutional Facially and as Applied

■ If the "defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim," the government may apply statutory aggravating factor number 12. 21 U.S.C. § 848(n)(12). Defendant argues that this factor is unconstitutional both facially and as applied to him.

An aggravating factor requiring a finding that the crime was committed in an "especially heinous, cruel, or depraved" manner would be unconstitutional. *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980); *Pretlow II,* 779 F.Supp. at 773. Nonetheless, the addition of the clause, "in that it involved torture or serious physical abuse to the victim" has been held to sufficiently modify the first phrase permitting it to pass constitutional scrutiny. *Pretlow II,* 779 F.Supp. at 773 (citing *Godfrey,* 446 U.S. at 431–32, 100 S.Ct. at 1766–67 (Stewart joined by Blackmun, Powell, and Stevens, JJ.). *See also Pitera,* 795 F.Supp. at 558; *Walton v. Arizona,* 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990); *United States v. Cooper,* 754 F.Supp. 617, 623 (N.D.Ill.1990) (finding § 848(n)(12) constitutional). These courts have held that this additional language clarifies the too vague "heinous, atrocious or cruel" language through the supplementary definition. This court agrees; this aggravating factor will not be dismissed.

### VIII. Whether the Relaxed Evidentiary Standard Applicable During the Penalty Phase is Constitutional

■ The evidentiary standard applicable to the penalty phase of proceedings under 21 U.S.C. § 848 is set forth in § 848(j) which provides:

> In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) and (n), or any other mitigating factor or any other aggravating factor for which notice has been provided.... Where information is presented relating to any of the aggravating factors set forth in subsection (n), information may be presented relating to any other aggravating factor for which notice has been provided.... Information presented may include the trial transcript and exhibits if the hearing is held before a

8. The government suggests that the remedy for any unfairness inherent in the weighing of a duplicative factor is "simply to instruct the jury that the aggravating factor duplicates an element of the crime so that they will not count it twice." (Gov't Brief Opp'n to Def. Pretrial Mot. at 39.)

One other district court has suggested that a curative instruction might alleviate any unfairness in the statutory scheme. *See Pitera,* 795 F.Supp. at 557. Perhaps such an instruction is warranted in the instant case.

jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors may be presented by either the government or the defendant, *regardless of its admissibility under the rules governing the admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.*

21 U.S.C. § 848(j) (emphasis added). Defendant contends that the evidentiary standard provided in § 848(j) authorizes an "evidentiary free-for-all" and fails to provide for a reliable penalty hearing. Furthermore, Defendant urges that this relaxed evidentiary standard curtails the reliability of the sentencing proceeding such that the standard itself is unconstitutional.

Defendant predicates this argument upon the assertion that a heightened level of reliability is constitutionally demanded of proceedings in which the death penalty is sought. Although Defendant's assertion is correct, *see, e.g., Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (opinion of Burger, C.J., with whom Stewart, Powell, and Stevens, JJ., joined), this heightened level of reliability has never been held to require that courts adhere to the same rules of evidence which govern the guilt stage of a trial. Rather, Chief Justice Burger's plurality opinion in *Lockett* indicated that a statutory procedure which precluded the sentencing authority from entertaining aspects of a defendant's character or record, and also circumstances of the offense proffered to lessen the sentence, undermined the reliability of the sentencing hearing and was thus unconstitutional. *Id.* One year later, in *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the Court held that a defendant's ability to present mitigating testimony at a death penalty proceeding could not be restricted through rigid adherence to a state evidentiary rule disallowing hearsay. *Id.* at 97, 99 S.Ct. at 2151.

Although these cases seem to indicate that a relaxed evidentiary standard is, in fact, preferred, Defendant argues that this preference is only applicable when a defendant presents mitigating evidence. However, the Supreme Court has previously held that the prosecutorial use of a relaxed evidentiary standard is appropriate. *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976). In *Williams,* the Court rejected a similar challenge and stated that all information concerning the defendant's life and characteristics was relevant to determining an appropriate sentence and that the judge should not "be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams,* 337 U.S. at 247, 69 S.Ct. at 1083. In *Gregg,* the Court extended *Williams* to sentencing proceedings conducted before a jury. The petitioner in *Gregg,* who faced a potential sentence of death, objected to the "wide scope of evidence and argument" permitted at the presentence proceeding. *Gregg,* 428 U.S. at 203, 96 S.Ct. at 2939 (opinion of Stewart, Powell, and Stevens, JJ.). The Court rejected the petitioner's argument and commended the Georgia court for not placing unnecessary restrictions on the evidence which could be received at penalty hearings. The Court further stated that "[s]o long as the evidence introduced and the arguments made at a presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions." *Id.* at 203–04, 96 S.Ct. at 2939. The evidentiary standard provided by 21 U.S.C. § 848(j) is consistent with the view expressed in both *Williams* and *Gregg.*

Defendant implies that the evidentiary standard articulated in § 848(j) will necessarily prejudice him. He asserts that the statute plainly would not recognize Confrontation Clause questions and objects to the fact that he is not *guaranteed* the safeguards embodied in the hearsay rules of the Federal Rules of Evidence. Although Defendant's concerns are not insubstantial, this Court is bound by the decisions in *Williams* and *Gregg.* Furthermore, § 848(j) does provide for the exclusion of evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or

misleading the jury. In considering an objection on these grounds, a court will many times be required to weigh the reliability of the evidence (or lack thereof) into the balance. In this way, many of the policies underlying the Federal Rules of Evidence may be addressed in the sentencing hearing even though strict adherence to the Rules themselves is not required. *See Pretlow II,* 779 F.Supp. at 771. In sum, this court finds that the evidentiary standard of § 848(j) is not so unreliable as to be unconstitutional. *See also Perry,* at 3; *Pitera,* at 564–66; *Pretlow,* 779 F.Supp. at 769–71.

## IX. Whether § 848(*o*)(1) is Unconstitutional

■ Section 848(*o*)(1) requires that the jury:

> return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

21 U.S.C. § 848(*o*)(1). Defendant argues that this provision limits his right to present mitigating evidence, specifically, evidence that his race or economic circumstances may have contributed to his alleged commission of the crimes in question.

■ As previously discussed, courts should construe legislation to comport with constitutional principles, if such a construction is possible. In this case, § 848 can be interpreted both to ensure the racial objectivity sought by the statute and to permit Defendant to present all the mitigating evidence that is helpful and relevant. Defendant is otherwise free to present evidence about his economic situation, racial discrimination that he has encountered, even any racial elements involved in the alleged offense or circumstances which led up to that

crime. The jury is permitted to consider such evidence. The jury is not permitted to use either Defendant's or his alleged victim's race as an independent factor to make the sentencing decision. The court cannot conclude that this prohibition precludes in any way Defendant's ability to present mitigating evidence. *See also Pretlow II,* 779 F.Supp. at 775.[9]

## X. Whether Defendant has been Singled Out Arbitrarily and Irrationally for a Capital Prosecution

■ Defendant contends that he has been arbitrarily and irrationally singled out for the death penalty. Specifically, he points to the failure of the government to seek the same penalty against defendant Jonathan Ray Bradley, the purported ring leader of the criminal enterprise. However, as the government accurately notes, only defendant Murray is alleged to have pulled the trigger and actually killed Juan Carlos–Bacallo.

Moreover, under the selective prosecution analysis set forth above, even assuming that Mr. Murray has been singled out for prosecution, the defense offers no evidence that this choice was motivated by any impermissible factor. *See, e.g., Pretlow II,* 779 F.Supp. at 777.

## XI. Whether the Death Penalty is Per Se Cruel and Unusual Punishment

■ Defendant contends that the death penalty is per se cruel and unusual punishment. Specifically, Defendant maintains that the punishment is racist, can be applied to innocent defendants, allows prosecutors unwarranted discretion, and may in the future evolve outside the standard of decency. Without addressing the merits of these honestly held positions, the court simply notes that the Supreme Court has not accepted these arguments. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 169, 177–184, 96 S.Ct. 2909, 2923, 2927–30, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (capital punishment is not per se cruel and unusual

---

9. However, neither can the court conclude, as the government contends, that by introducing evidence of racial discrimination, Defendant loses the protection of § 848(*o*)(1). (Gov't Br. at 14.)

punishment); *McCleskey,* 481 U.S. at 296–97, 300–01, 107 S.Ct. at 1769–70, 1771–72; *Pitera,* 795 F.Supp. at 552; *Pretlow II,* 779 F.Supp. at 777–78. In light of the substantial precedent indicating that at this time the death penalty is not per se cruel and unusual punishment, the court must reject this argument.

An appropriate order will be issued.

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED:**

(1) Defendant Murray's pretrial motion is **GRANTED** in part and **DENIED** in part:

(a) Until May 20, 1994, Defendant Murray may seek discovery from the government regarding his selective prosecution claim.

(b) Non-statutory aggravating factors (7) and (8) are **DISMISSED.**

(c) The defense may submit, no later than May 13, 1994, a brief detailing what procedures and standard of review he believes appropriate in this court's determination of the admissibility of the two uncharged murders allegedly committed by Mr. Murray. The government may respond and the defense may reply within the time frame set by the Rules of Court for the Middle District.