## UNITED STATES of America

v.

## Michael J. O'DRISCOLL

No. 4:CR–01–277.

United States District Court, M.D. Pennsylvania.

July 8, 2002.

amended notice of its intent to seek the death penalty.

A pretrial conference was held on March 25, 2002, and we issued an order on March 27, 2002, setting various scheduling deadlines and placing this case on the October, 2002, trial list. Paragraph 7 of the March 27th order provides that "[a] hearing shall commence on the first opening in our trial calendar after June 17, 2002, to determine the reliability of any and all evidence of unadjudicated acts of violence and misconduct the government intends to present during the penalty phase of the trial." Briefing with regard to the standard to be employed by the court for determining reliability was concluded on April 12, 2002, when the government filed its reply brief. Footnote 1 of that reply brief stated as follows:

> The Court's scheduling order anticipates a hearing on this issue. The United States respectfully suggests that the issue can be resolved on the briefs and other written submissions by the parties. If the Court believes a hearing is necessary, the United States requests at least 30 days notice to arrange for the movement of the defendant by the United States Marshals Service.

By order of April 30, 2002, we directed the government to file its "written submissions" relating to the unadjudicated acts of violence and misconduct and a brief in support by May 17, 2002, and O'Driscoll was authorized to file an opposing brief on or before May 31, 2002.

On May 17, 2002, the government filed a brief in support and six volumes of exhibits which are in excess of 1000 pages. At a conference held on May 24, 2002, relating to a proposed juror questionnaire counsel for O'Driscoll stated co-counsel had discussed with government counsel the need for an extension of time to respond to the

James T. Clancy, Eric Pfisterer, U.S. Attorney's Office, Harrisburg, PA, for U.S.

Michael J. O'Driscoll, USP-Allenwood, White Deer, PA, pro se.

David A. Ruhnke, Ruhnke & Barrett, Montclaire, NJ, Ronald C. Travis, Rieders Travis, Williamsport, PA, for Michael J. O'Driscoll.

### SEALED ORDER

MUIR, District Judge.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On August 29, 2001, a federal grand jury returned an indictment charging Michael J. O'Driscoll with first-degree murder. On September 21, 2001, O'Driscoll appeared before the court for arraignment and entered a not guilty plea. On October 9, 2001, the government filed a notice of its intent to pursue the death penalty. On March 14, 2002, the government filed an

government's exhibits and brief in support. The court advised counsel that he should file a motion for extension of time.

On May 28, 2002, the court issued an order continuing sine die the hearing regarding the reliability of the evidence of unadjudicated acts of violence and misconduct. On May 29, 2002, counsel for O'Driscoll filed a motion for extension of time to respond to the United States's proffer of evidence. By order of May 31, 2002, the court granted O'Driscoll an extension of time until June 10, 2002, to file a response to the government's proffer of evidence. On June 10, 2002, O'Driscoll filed a document entitled "Brief in Opposition to the Government's Motion to Proffer of Evidence of Unadjudicated Conduct Without an Evidentiary Hearing." On June 27, 2002, the government filed a reply brief. Therefore, the matter is ripe for disposition.

The court is presented with a very difficult issue. We will commence our discussion by outlining the unadjudicated conduct which the government proposes to offer during the penalty phase of the trial. First, the government proposes to offer evidence regarding the following three unadjudicated acts of violence as distinct non-statutory aggravating factors to be considered and weighed by the jury:

(1) The assault and robbery of 78–year-old Howard Shirtcliff in Belcherton, Massachusetts, on June 4, 1982;

(2) The aggravated assault and robbery of Irwin Kass in Colorado on January 20, 1983; and

(3) The premeditated murder of Kent Leslie Martin in Kansas on or about January 21, 1983.

The government also proposes to offer evidence of unadjudicated acts of violence and misconduct in support of the non-statutory aggravating factor of future dangerousness. The government states it intends to offer in support of the non-statutory aggravating factor of future dangerousness evidence of the following:

(1) Stabbing of Ernest B. Stacey during a robbery on December 18, 1978, in West Springfield, Massachusetts;

(2) Assault and robbery of Howard Shirtcliff, age 78, and theft of his handgun on June 4, 1982, in Belcherton, Massachusetts;

(3) Shooting and robbery of Fred Swartzel and son on June 5, 1982, in Chicopee, Massachusetts;

(4) The aggravated assault and robbery of Irwin Kass in Colorado on January 20, 1983;

(5) The premeditated murder of Kent Leslie Martin in Kansas on or about January 21, 1983;

(6) Armed bank robbery of Peoples Bank in Holyoke, Massachusetts, using Kent Leslie Martin's car on January 31, 1983;

(7) Armed bank robbery of Pioneer National Bank in Easthampton, Massachusetts, after which the defendant stole a car at gunpoint and locked victims in trunk of abandoned getaway car in Huntingdon, Massachusetts on July 6, 1983;

(8) Escape attempt and assault of United States Marshals while traveling westbound on Interstate 84 in Pennsylvania on January 5, 1984;

(9) Escape attempt at United States Penitentiary, Ft. Leavenworth, Kansas on November 9, 1991;

(10) Escape plot at United States Penitentiary, Lewisburg, Pennsylvania, on April 19, 1995;

(11) Possession of escape paraphernalia at United States Penitentiary, Lewisburg, Pennsylvania, on July 26, 1996;

(12) Possession of shank in Special Housing Unit at United States Penitentiary Allenwood on October 14, 1998;

(13) Assault on corrections staff resulting in use-of-force team in Special Housing Unit on April 30, 2001; and

(14) Assault on corrections staff resulting in use-of-force team in Special Housing Unit on April 9, 2002.

The government has submitted documentary evidence and two videotapes in support of the above alleged acts of violence and misconduct.

We will now address the standard to be applied in determining whether such evidence is admissible during the penalty phase of the trial. First, we observe that some courts have concluded that evidence of unadjudicated offenses and misconduct should not be admitted during a capital sentencing proceeding. *See, e.g., Commonwealth v. McCoy*, 405 Pa. 23, 172 A.2d 795, 799 (1961) (such evidence may confuse the jury and deprive an accused of an orderly trial); *State v. McCormick*, 272 Ind. 272, 397 N.E.2d 276, 281 (1979) (expressing the concern that a jury which had already convicted defendant of murder would be tainted in passing on the likelihood of his having committed other like offenses). The Court of Appeals for this circuit has not decided whether such evidence is admissible. However, the Court of Appeals for the Fifth Circuit has concluded that such evidence is not per se inadmissible. *United States v. Hall*, 152 F.3d 381, 404 (5th Cir.1998). Similarly, a judge of this district has stated that there is "no binding or even persuasive authority that the court should per se exclude evidence of [unadjudicated offenses]." *United States v. Bradley*, 880 F.Supp. 271, 287 (M.D.Pa.1994) (Rambo, J.). In *Bradley* the court concluded that "the best solution in the absence of case law to the contrary" was "to permit the introduction of the

evidence upon a showing of reliability." *Id.*

The Federal Death Penalty Act of 1994 provides only minimal guidance regarding how to determine whether evidence regarding unadjudicated acts of violence and misconduct is reliable. That statute in relevant part provides as follows:

> The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c). This statute, however, does not "permit an evidentiary free-for-all that undermines reliability." *United States v. Beckford*, 964 F.Supp. 993, 1002 (E.D.Va.1997) (Payne, J.).

The elimination of the Rules of Evidence from federal death penalty proceedings greatly concerns us. Of particular concern is the use of hearsay testimony in support of unadjudicated acts of violence or misconduct. Hearsay is generally inadmissible because it is considered unreliable. *See* Introductory Advisory Committee Notes to Federal Rules of Evidence 801 through 807. It is considered unreliable because the declarant is not subject to cross-examination. *Id.* The finder of fact cannot view the witness and evaluate his perception, memory, and narration. *Id.*

█ At least one court has pointed out that § 3593(c) is just the starting point in determining whether evidence or "information" is reliable. *See United States v. Pitera*, 795 F.Supp. 546, 565 (E.D.N.Y. 1992) ("The heightened standard applicable to capital sentencing proceedings may

... demand further indicia of reliability before a court can say that the probative value of any such hearsay outweighs its prejudicial potential."). We are obligated under § 3593 to engage in a weighing process. One court has observed that this "weighing process will preclude the use of unadjudicated criminal conduct which lacks firm evidentiary support...." *United States v. Beckford*, 964 F.Supp. at 1002. We conclude that where the government attempts to use unadjudicated acts of violence and misconduct the heightened standard of reliability applicable to capital sentencing proceedings requires that the hearsay rule be fully applicable to the penalty phase proceeding. In other words unadjudicated acts of violence or misconduct cannot be proven by hearsay testimony unless a well-recognized exception to the hearsay rule is applicable.

In assessing the reliability of evidence it is clear that we do not engage in weighing credibility of the witnesses. *See United States v. Beckford*, 964 F.Supp. at 1004. Consequently, we are satisfied that we can make a determination regarding the admissibility of the unadjudicated acts of violence and misconduct based on the government's proffer of evidence.

Information regarding unadjudicated acts of violence and misconduct will be found reliable only under the following circumstances:

(1) a juror would be justified in relying on such information in voting for a sentence of death;

(2) the probative value of the information is outweighed by other considerations, such as remoteness in time or danger of unfair prejudice;

(3) the information satisfies the Constitution's requirement of heightened reliability for information presented by the government at the sentencing phase of a capital case.

Where a defendant faces the ultimate penalty of death the Confrontation Clause of the Sixth Amendment requires that despite § 3593(c) unadjudicated acts of violence and misconduct be proven by the government in accordance with the Federal Rules of Evidence. *See, e.g., White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848. 355 n. 8 (1992). In light of the above standard we will now review the government's proffer of evidence.

A. Unadjudicated criminal acts offered as non-statutory aggravating factors.

    1. The Assault and Robbery of Howard Shirtcliff on June 4, 1982.

■ The proffer of evidence submitted by the government reveals that in 1982 Howard Shirtcliff was 78 years of age. Mr. Shirtcliff died in 1995. The investigating officer, however, has a recollection of the events, viewed in person the injuries to Mr. Shirtcliff, and took a statement from him shortly after the assault and robbery occurred. Furthermore, neighbors of Mr. Shirtcliff observed his injuries shortly after the incident. Mr. Shirtcliff was assaulted and robbed in his home. He was bound, gagged, pistol whipped and an attempt was made to suffocate him with a pillow. A .22 caliber Smith and Wesson handgun and ammunition belonging to Mr. Shirtcliff were stolen. The perpetrator also stole Mr. Shirtcliff's wallet containing identification, driver's license, photos, papers and approximately $65.00. The police investigation disclosed that a person matching O'Driscoll's description was seen leaving the area near Mr. Shirtcliff's residence at the time of the assault and robbery. A car was seen parked near the front of the Shirtcliff home the afternoon of the crime which matched in description the car of O'Driscoll's girlfriend Christine Blake. Blake gave a statement and grand jury testimony implicating O'Driscoll.

Specifically, she admitted that she had earlier told O'Driscoll about Mr. Shirtcliff being old, having a gun and being wealthy. She stated that she and O'Driscoll were in the area when the crime occurred and that she lent her car to O'Driscoll the afternoon of the crime. Furthermore, Blake testified that O'Driscoll admitted to her that he committed the crime.

A friend of O'Driscoll, Robert Noll, testified at a deposition on August 5, 1982, that at a time shortly after the robbery O'Driscoll came to his house when Noll was upstairs in the shower. When Noll came downstairs he found O'Driscoll with his shirt off and washing out a blue shirt in his sink.

Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll assaulted and robbed Howard Shirtcliff on June 4, 1982.

2. The aggravated assault and robbery of Irwin Kass in Colorado on January 20, 1983.

In 1984 O'Driscoll was convicted of kidnapping in the United States District Court for the District of Colorado.[1] During the course of O'Driscoll's kidnapping trial Irwin Kass testified, under oath and subject to cross-examination by O'Driscoll's trial attorney, that on January 20, 1983, O'Driscoll twice entered his pawn shop. The second time O'Driscoll entered the pawn shop, he robbed Mr. Kass at gunpoint and ordered Mr. Kass to get down on his hands and knees. Before

leaving the store, O'Driscoll severely beat Mr. Kass in the head with a handgun. Mr. Kass required 100 stitches and a blood transfusion, and during the assault suffered three broken teeth, two broken fingers, and a severely torn ear. Mr. Kass positively identified O'Driscoll as the man who robbed and beat him.

Karen Tietgens, another girlfriend and bank robbery accomplice of O'Driscoll, testified at O'Driscoll's kidnapping trial that O'Driscoll traveled to the pawn shop in a yellow van. She testified that O'Driscoll went into the pawn shop with a gun and a newspaper and that when he came back out he still had the gun and the newspaper had on it what appeared to be blood. She further testified that the van was later abandoned at a mall where they kidnapped Kent Martin and took Mr. Martin's car. Police recovered the yellow van previously bought by O'Driscoll using a false identification and during a search found human blood on the van door and a newspaper inside stained with what appeared to be blood.

Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll assaulted and robbed Irwin Kass on January 20, 1983.

3. The premeditated murder of Kent Leslie Martin in Kansas on or about January 21, 1983.

The evidence presented at O'Driscoll's kidnapping trial revealed that after robbing and assaulting Irwin Kass, O'Driscoll

---

1. O'Driscoll was sentenced to a term of imprisonment of 25 years for armed bank robbery and a consecutive term of imprisonment of 300 years for kidnapping. *United States v. O'Driscoll*, 586 F.Supp. 1486, 1494–1495 (D.Colo.1984) (Kane, J.). Those sentences were affirmed by the Court of Appeals for the Tenth Circuit. *United States v. O'Driscoll*, 761 F.2d 589 (10th Cir.1985), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986).

and Karen Tietgens drove to a mall in Colorado and there abducted Kent Leslie Martin at gun point. O'Driscoll along with Karen Tietgens drove Mr. Martin's automobile to Kansas. After arriving in Kansas Ms. Tietgens was dropped off at a motel and O'Driscoll drove off with Mr. Martin. According to Ms. Tietgens within a short period of time O'Driscoll returned alone to the motel. On January 23, 1983, the body of Mr. Martin was found riddled with ten (10) gunshot wounds. Firearm ammunition shell casings found next to Mr. Martin's body were matched to a handgun recovered from O'Driscoll at the time of his arrest. O'Driscoll admitted to both Karen Tietgens and Christine Blake that he killed Mr. Martin. O'Driscoll's fingerprint was found on the rear view mirror of Mr. Martin's car recovered in Groton, Massachusetts on February 8, 1983.

Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll killed Kent Martin.

B. Unadjudicated criminal acts and misconduct offered as evidence of the aggravating factor of future dangerousness.

1. Stabbing of Ernest B. Stacey during a robbery on December 18, 1978, in West Springfield, Massachusetts.

██ The government's proffer reveals that O'Driscoll robbed Mr. Stacey at knifepoint and in the course of the robbery stabbed Mr. Stacey in the hand. Both Mr. Stacey and a Michael Leavenworth who knew O'Driscoll well identified him as the attacker. Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evi-

dence and beyond a reasonable doubt that O'Driscoll stabbed Earnest B. Stacey.

2. Assault and robbery of Howard Shirtcliff.

As noted in part A above the government's proffer is sufficient with respect to this incident of unadjudicated criminal conduct.

3. Shooting and robbery of Fred Swartzel and his son Dennis Swartzel on June 5, 1982, in Chicopee, Massachusetts.

The government's proffer reveals that a man matching a description of O'Driscoll and an accomplice entered the home of Mr. Swartzel posing as mail delivery persons. After entering the home O'Driscoll robbed and shot both Fred and Dennis Swartzel. The amount stolen from the Swartzels was $2500 in cash. Christine Blake in a statement to the FBI on December 23, 1982, stated that O'Driscoll admitted to her that he was involved in the robbery and that he shot Fred Swartzel. Robert Noll testified that O'Driscoll admitted to him that he was involved in the robbery. During O'Driscoll's kidnapping trial, O'Driscoll testified that someone did get shot in the course of his escapades but denied that he shot Kent Martin. The only other case where O'Driscoll was charged with shooting someone was the shooting of the Swartzels. Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll robbed and assaulted the Swartzels.

4. The aggravated assault and robbery of Irwin Kass.

As noted in part A above the government's proffer is sufficient with respect to

this incident of unadjudicated criminal conduct.

5. The premeditated murder of Kent Leslie Martin.

As noted in part A above the government's proffer is sufficient with respect to this incident of unadjudicated criminal conduct.

6. Armed bank robbery of Peoples Bank in Holyoke, Massachusetts, using Ken Martin's car on January 31, 1983.

The government's proffer reveals that the bank manager positively identified O'Driscoll as the person who robbed the bank. Another witness described the getaway car as matching a description of Kent Martin's car. O'Driscoll testified at his trial in Colorado that he used Mr. Martin's car to commit the bank robbery. Specifically O'Driscoll testified as follows:

Q. January 31st, 1983, you stuck up People's Savings Bank on South Street in Holyoke, Massachusetts; isn't that right?

A. I don't wish—I'm not going to answer that. I haven't been tried for that. It's against my rights. I see the gun, it's my gun.

Q. Do you remember dropping the clip out of this gun January 31st, 1983?

A. No.

Q. Do you remember seeing the clip on television, Mr. O'Driscoll?

A. Yeah.

Q. And you dropped the clip out of the gun during the course of that bank robbery, didn't you?

A. I don't recall.

Q. You don't remember?

A. No.

Q. You remembered when Agent Adams talked to you about it. You told him in great detail how you dropped the clip out of the gun, did you not?

A. Yes.

Q. And this is the gun that you bought in the pawnshop in Denver, is it not?

A. Yes.

Q. And this then is the gun that you dropped the clip out of during the bank robbery that occurred eight days after Mr. Martin's body was found; isn't that right?

A. Yes.

Q. And during that particular bank robbery, you were driving Mr. Martin's car, were you not?

A. Yes, I was.

Q. I'm going to show you Government's Exhibit 6, Mr. O'Driscoll. Do you recognize the car in that photograph?

A. Yes.

Q. That's, to use your expression, the dead man's car, right?

A. Yes.

Q. And you happened to be in the dead man's car sticking up a bank in Massachusetts with this gun in your hand eight days after Mr. Martin's body was found in the wheat field in Kansas, right?

A. Yes.

Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll robbed the Peoples Bank in Holyoke, Massachusetts, on January 31, 1983.

7. Armed bank robbery of Pioneer National Bank in Easthampton, Massachusetts after which O'Driscoll commandeered a car at gunpoint and locked victims in trunk of an abandoned getaway car in Huntingdon, Massachusetts, on July 6, 1983.

The government's proffer reveals that both of · O'Driscoll's accomplices in this

bank robbery cooperated and gave statements concerning O'Driscoll's involvement. Physical evidence recovered from the getaway car included fake identification for O'Driscoll.

Later on the day of the bank robbery, O'Driscoll forced Barbara A. Bland and Holly Lebreque at gunpoint to drive him to meet an accomplice. O'Driscoll then forced them into the trunk of the car so he could complete his getaway in another vehicle. Both women were left in the trunk. After several hours they managed to escape. Based on the foregoing proffer and the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll robbed the Pioneer National Bank in Easthampton, Massachusetts after which O'Driscoll commandeered a car at gunpoint and locked victims in trunk of an the abandoned getaway car in Huntingdon, Massachusetts, on July 6, 1983.

8. Escape attempt and assault of United States Marshals while traveling westbound on Interstate 84 in Pennsylvania on January 5, 1984.

The government's proffer reveals that it intends to call the United States Marshals involved in the incident. The report of the incident by Paul F. Dunne of the United Marshals Service states in relevant part as follows:

> On Thursday, January 5th 1984 DUSM Joseph Thomas and myself were assigned a prisoner trip to Lewisburg, PA. We were to transport Kenneth R. Wightman incarcerated at Mass Correctional Institution, Walpole, MA and Michael O'DRISCOLL, incarcerated at the Adult Correctional Institution, Cranston, RI ..... [W]e placed O'Driscoll in the rear seat next to WIGHTMAN. O'Driscoll was secured by leg irons, waist chain and handcuffs that had been wrapped in black electrical tape to block access to the keyholes.... While traveling on Interstate 84 westbound at approximately 2:25 P.M., O'DRISCOLL, who was seated directly behind Thomas who was operating the vehicle, lunged between the front seats of the vehicle yelling and attempting to grab Thomas's weapon. I was seated next to Thomas and immediately grabbed O'DRISCOLL's hands with my right hand and fended off kicks to the shoulder area by WIGHTMAN with my left arm. As this was happening, Thomas was attempting to hold his weapon in the holster and maintain control of the vehicle which was travelling at 55 MPH. Thomas applied the brakes and the car spun around on the highway finally striking the guardrail on the extreme left side of the road.

Based on the foregoing proffer along with the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll attempted to escape and assault United States Marshals on January 5, 1984.

9. Escape attempt from United States Penitentiary at Leavenworth on November 9, 1991.

The government in its proffer states as follows:

> Evidence will be presented by prison staff that they discovered an escape attempt that involved the cutting of two bars from windows in the cell block in which the defendant was housed. The defendant was reported by one reliable Confidential Informant ("C.I.") as wanting to go borrow money to buy hacksaw blades and as being present when one of the bars was cut. Another C.I. identi-

fied the defendant as one of the lookouts for the bar cutting.

It is not clear whether the government during the penalty phase of the trial intends to present testimony from the Confidential Informant. However, based on the foregoing proffer along with the documentary evidence, and assuming the government will not rely on hearsay, we are satisfied that the government can prove beyond a reasonable doubt that O'Driscoll attempted to escape from USP–Leavenworth on November 9, 1991.

10. Escape plot from the United States Penitentiary, Lewisburg, Pennsylvania, on April 19, 1995.

The government in its proffer states as follows:

The defendant was identified by a reliable confidential informant as being involved in an escape attempt involving the use of a hacksaw blade with other inmates. A search of the defendant's cell disclosed a hacksaw blade recovered from the defendant's wall locker.

Again it is not clear whether the government during the penalty phase of the trial intends to present testimony from the Confidential Informant. However, based on the foregoing proffer along with the documentary evidence, and assuming the government will not rely on hearsay, we are satisfied that the government can prove beyond a reasonable doubt that O'Driscoll attempted to escape from USP–Lewisburg.

11. Possession of escape paraphernalia at the United States Penitentiary, Lewisburg, Pennsylvania, on July 26, 1996.

The government in its proffer states as follows:

On July 26, 1996, a routine shakedown of the A-block recreation area disclosed a homemade 21–foot–long braided rope with metal clip attached, an oversized green raincoat camouflaged with paint and grass and a hood with eye sockets cut out. Further investigation resulted in the search of the defendant's cell where human hair was found wrapped in a folded paper towel in the trash can. Additionally, two containers of different shades of green paint were found hidden in the defendant's cell. This paint matched the paint found on the camouflaged raincoat. This evidence is sufficient to conclude that the defendant was involved in the creation of the aforementioned escape paraphernalia.

Based on the foregoing proffer along with the documentary evidence we have no doubt that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll possessed escape paraphernalia on July 26, 1996.

12. Possession of a shank in Special Housing Unit, United States Penitentiary at Allenwood on October 14, 1998.

The government in its proffer states as follows:

On October 14, 1988, prison staff conducted a routine shakedown of the cells in the Special Housing Unit. Staff will testify that in the single cell of the defendant a shank was found.

First, we note that this incident according to the documentary evidence occurred on October 14, 1998, *not October 14, 1988*. It appears the government intends to call the corrections personnel who conducted the search at issue and found the "shank." However, the "shank" at issue was found behind a sealed shower panel that could only be opened with a special tool. No such tool was found in O'Driscoll's cell. The proffer is also silent on how long O'Driscoll had been in the cell prior to the discovery of the shank and when the last

time the shower panel had been removed for inspection. Based on the proffer and documentary evidence we cannot conclude that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt or even by a preponderance of the evidence that O'Driscoll possessed the shank in question. We will prohibit the government from presenting evidence during the penalty phase of the trial regarding O'Driscoll's possession of the shank.

13. After refusing to cuff-up and return to his cell, a use of force team was utilized to remove O'Driscoll from a recreation pen on April 30, 2001.

The government proffered a videotape which reveals that on April 30, 2001, O'Driscoll was in a recreation pen at the Allenwood United States Penitentiary. O'Driscoll refused to cuff-up and return to his cell when ordered to do so by correctional staff. A use of force team was assembled, entered the recreation pen, subdued O'Driscoll and carried him to his cell. As the team entered the recreation pen O'Driscoll charged and resisted the team. Two of the officers suffered minor abrasions during the encounter. The videotape reveals that given the opportunity O'Driscoll would assault correctional staff and is probative of future dangerousness. Based on the proffer we conclude that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll assaulted or attempted to assault correctional staff on April 30, 2001.

14. After refusing to cuff-up and return to his cell, a use of force team was utilized to remove O'Driscoll from a recreation pen on April 9, 2002.

The government proffered a videotape which reveals that on April 9, 2002, O'Driscoll was in a recreation pen at the Allenwood United States Penitentiary. O'Driscoll refused to cuff-up and return to his cell when ordered to do so by correctional staff. A use of force team was assembled, entered the recreation pen, subdued O'Driscoll and carried him to his cell. As the team entered the recreation pen O'Driscoll charged and resisted the team. None of the officers suffered injury during the encounter. The videotape reveals that given the opportunity O'Driscoll would assault correctional staff and is probative of future dangerousness. Based on the proffer we conclude that the government can prove in accordance with the Federal Rules of Evidence and beyond a reasonable doubt that O'Driscoll assaulted or attempted to assault correctional staff on April 9, 2002.

Other than item number 12 we are satisfied that the proffer of the government is reliable. Evidence of the unadjudicated acts of violence and misconduct may be admitted during the penalty phase of the trial subject to the condition set forth above.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The government may present evidence of O'Driscoll's unadjudicated acts of violence and misconduct during the penalty phase of the trial as set forth in the background of this order.

2. This order shall remain under seal until further order of court or January 1, 2003, whichever occurs first.